In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 20-1792

ANTHONY MAYS, individually and on behalf of a class of similarly situated persons, *et al.*,

*Plaintiffs-Appellees,*

*v.*

THOMAS J. DART, Sheriff of Cook County, Illinois,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court
for the Northern District of Illinois.
No. 20-cv-2134 — **Matthew F. Kennelly,** *Judge.*

───────────────

ARGUED AUGUST 18, 2020 — DECIDED SEPTEMBER 8, 2020

───────────────

Before SYKES, *Chief Judge,* and BRENNAN and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Plaintiffs—a class of detainees at the Cook County Jail—brought this action against Cook County Sheriff Thomas Dart after the Jail reported an outbreak of COVID-19, the disease caused by the novel coronavirus that has sparked a global pandemic. Plaintiffs contend that the

Sheriff has violated their Fourteenth Amendment Due Process rights by failing to provide them with reasonably safe living conditions as the pandemic rages. Plaintiffs seek various forms of relief, including an injunction requiring the Sheriff to implement certain procedures related to social distancing, sanitation, diagnostic testing, and personal protective equipment ("PPE") to protect them from the virus for the duration of the pandemic.

After a hearing, the district court granted a temporary restraining order imposing several forms of relief, including but not limited to, mandates requiring the Sheriff to provide hand sanitizer and soap to all detainees and face masks to detainees in quarantine. The district court declined to order relief in several instances, though: most notably for our decision today, the district court rejected Plaintiffs' request to prohibit double celling and group housing arrangements to permit adequate social distancing.

Plaintiffs subsequently moved for entry of a preliminary injunction, requesting an extension of the relief the district court previously mandated in the temporary restraining order and, among other things, renewing their request for socially distanced housing. After another hearing, the district court switched course from its prior ruling and granted the renewed social distancing request, albeit with certain exceptions. The district court also granted the request for an extension of the relief included in the temporary restraining order. The Sheriff appealed.

We conclude that, in the course of its analysis regarding double celling and group housing, the district court committed three distinct legal errors: the district court failed to consider the Sheriff's conduct in its totality, failed to afford

proper deference to the Sheriff's judgment in adopting policies necessary to ensure safety and security, and cited an incorrect legal standard when evaluating the likelihood that Plaintiffs' claims will succeed on their merits. Given these legal errors in evaluating the likelihood of success on the merits of Plaintiffs' claims, we reverse the district court with respect to the portion of the preliminary injunction mandating socially distanced housing. Regarding the remaining relief, however, the district court made detailed factual findings, properly considered the Sheriff's conduct in its totality, and closely tailored the relief it ordered to the guidelines promulgated by the Centers for Disease Control and Prevention ("CDC"). We therefore affirm all other aspects of the preliminary injunction.

## I. Background

### A. Factual Background

At present, COVID-19 requires no introduction: the novel coronavirus causing this disease has spread around the world, resulting in an unprecedented global pandemic that has disrupted every aspect of public life. The virus, SARS-CoV-2, causes symptoms ranging from fever to shortness of breath to loss of smell and can lead to serious health effects—including damage to internal organs and, in many cases, death. People over the age of sixty-five and with certain preexisting health conditions face a heightened risk of severe illness resulting from COVID-19. The virus transmits rapidly from person to person, primarily through respiratory droplets emitted by coughing or sneezing that can travel multiple feet and remain in the air for several hours, and also through lingering particles on surfaces. People may transmit the virus

despite a lack of symptoms, making it difficult to take necessary precautions.

Society has, though, taken many precautions to attempt to curb the spread of COVID-19. Many states, including Illinois, presently require wearing face coverings in public spaces in order to slow the spread of COVID-19. States have ramped up testing capacity and contact tracing to identify those who have interacted with persons who later tested positive for the virus. Illinois and most other states implemented stay-at-home orders that forced people to socially distance, limiting interpersonal contacts and group activities: schools transitioned to remote learning, restaurants and bars closed, and officials largely cancelled public events.

The Cook County Jail is an enormous facility with the population of a small town. The inherent nature of the Jail presents unique challenges for combatting the spread of COVID-19: it is designed to accommodate large and densely-packed populations. Many detainees reside in "dormitory" units, meaning hundreds of detainees sleep in a single room on closely-spaced bunk beds, and there are many common spaces where detainees are in close proximity to one another. On April 8, 2020, *The New York Times* reported that, at that time, the Jail was the largest known-source of coronavirus infections in the United States. Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars* (April 8, 2020) N.Y. Times, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last visited August 27, 2020). When Plaintiffs filed their motion for a preliminary injunction, on April 14, 541 detainees and Jail staff had tested positive for COVID-19. By April 23, only a few days before the district court issued the

preliminary injunction that is the subject of this appeal, six detained persons had died from complications.

On March 23, the Center for Disease Control issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Guidelines"). The document "is intended to provide guiding principles for healthcare and non-healthcare administrations of correctional and detention facilities" to "help reduce the risk of transmission and severe disease from COVID-19" in light of the unique challenges correctional and detention facilities present. The Guidelines recommend various measures, including making available sufficient hygiene and cleaning supplies, frequently cleaning and disinfecting high-touch surfaces and objects, and implementing social distancing strategies where feasible, among many others. The Guidelines note, in bold font, that the "guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Additionally, in the section recommending the implementation of social distancing in jails, the CDC's guidance notes "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff."

The Cook County Sheriff, who is responsible for operating the Jail, took numerous proactive measures to prevent the spread of COVID-19. As early as January 24, Roland Lankah, the Sheriff's in-house Environmental Health Specialist and epidemiologist, began coordinating with the Cook County Health Infection Control Department to develop a plan for an outbreak. That plan involved increasing disinfection and sanitization, devising protocols to screen detainees for symptoms, and moving infected detainees to separate housing.

Upon Governor Pritzker's declaration of Illinois as a disaster
area on March 9, the Sheriff set up a space for new detainees
to quarantine for seven to fourteen days before entering the
general population. By mid-March, First Assistant Executive
Director Michael Miller was working to open three closed di-
visions of the Jail to create more single-cell units and reduce
density. The Sheriff also coordinated with Senator Durbin's
office, the Federal Emergency Management Agency, and
Governor Pritzker's office to receive priority access to the na-
tional stockpile of PPE in Illinois. The Sheriff engaged various
consultants, including a former CDC Director, to improve
sanitation policies, policies relating to medical screening, and
use of PPE. In coordination with other stakeholders in the
Cook County criminal justice system, the Sheriff undertook
efforts to reduce the Jail population through securing release
or electronic monitoring for over 1,200 detainees. And, on
April 1, the Sheriff's Office contacted local authorities to ob-
tain approval to administer Abbott Laboratories' rapid test at
the Jail. Cermak Health Services, a division of the Cook
County Health and Hospital Systems, began administering
these tests soon thereafter.

**B. Procedural Background**

On April 3, Anthony Mays and Kenneth Foster, two de-
tainees at the Cook County Jail, sued Cook County Sheriff
Thomas Dart on behalf of "all people who are currently or
who will in the future be housed in the Cook County Jail for
the duration of the COVID-19 pandemic." The class includes
two subclasses: Subclass A, which consists of all people who
are at an elevated risk of complications from COVID-19 due
to age or an underlying medical condition, and Subclass B,
which consists of all people housed on a tier where someone

has tested positive for the virus. They assert violations of their rights under the Fourteenth Amendment to reasonably safe living conditions, bringing claims under 42 U.S.C. § 1983 and for writs of habeas corpus under 28 U.S.C. § 2241.

### 1. Temporary Restraining Order

Plaintiffs moved for a temporary restraining order, requesting that the district court order the Sheriff to enact multiple measures designed to prevent the spread of COVID-19. On April 9, after conducting a hearing via telephone and reviewing numerous affidavits Plaintiffs submitted, the district court issued a temporary restraining order, though one considerably narrower than the order Plaintiffs requested. This temporary restraining order compelled the Sheriff to do the following:

- To establish "a policy requiring prompt coronavirus testing of detainees who exhibit symptoms consistent with coronavirus disease as well as, at medically appropriate times and to the extent feasible based on the acquisition of sufficient testing materials, detainees who have been exposed to others who have exhibited those symptoms or have tested positive for coronavirus."

- To enforce "social distancing during the new detainee intake process, including suspending the use of bullpens to hold new detainees awaiting intake."

- To provide "soap and/or hand sanitizer to all detainees in quantities sufficient to permit them to frequently clean their hands" and "adequate sanitation supplies to enable all staff and detainees to regularly sanitize surfaces and objects on which the virus could be

present, including in all areas occupied or frequented by more than one person (such as two-person cells, as well as bathrooms and showers)."

- To establish "a policy requiring sanitization between all uses of frequently touched surfaces and objects as well as monitoring and supervision to ensure that such sanitization takes place regularly."

- To "provide facemasks to all detainees who are quarantined—i.e., those who have been exposed to a detainee who is symptomatic (even if not coronavirus-positive)."

In imposing this relief, the district court made detailed factual findings about the policies the Sheriff had enacted and his successes and shortcomings in executing those policies. Throughout its decision, the district court relied heavily on the CDC Guidelines. Where the district court elected to impose the requested relief, the court noted that the evidence showed the Sheriff's collective actions fell short of those recommended in the CDC Guidelines.

In several instances, though, the district court declined to implement additional relief where the evidence revealed that the Sheriff already had a policy in place—such as one requiring a fourteen-day quarantine of all new detainees—or existing measures were sufficient—such as those to enforce the use of PPE by Jail staff who come into contact with detainees. The court also overruled Plaintiffs' requests for mandatory social distancing throughout the Jail and a directive to identify detainees who are at high risk for complications from COVID-19. In these instances, the court was unpersuaded that

Plaintiffs were likely to succeed on the merits of their claim that the Sheriff's conduct posed a constitutional violation.

Regarding social distancing in particular, the district court acknowledged the Sheriff's "ongoing effort[s] to modify custodial arrangements" at the Jail to "permit greater separation of detainees," but noted that "space constraints" at the Jail preclude "complete social distancing." The court cited the CDC Guidelines, which "expressly recognize that complete social distancing may not be possible in the sleeping areas of a jail." The court also acknowledged that "[s]pace constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large." The court thus concluded that "plaintiffs have [failed] to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing" and that this was "particularly so because the Sheriff's submission reflects an ongoing effort to modify custodial arrangements at the Jail in a way that will permit greater separation of detainees."

### 2. *Preliminary Injunction*

On April 14, Plaintiffs moved for entry of a preliminary injunction. Relevant to our decision today, Plaintiffs sought to extend the relief the court imposed in the temporary restraining order and again requested a mandate for social distancing throughout the Jail. The Sheriff opposed the motion, and, regarding the request for social distancing, argued that his efforts were consistent with the CDC Guidelines, that he had already taken substantial steps to implement social distancing, and that further steps were impossible. The Sheriff submitted a progress report on efforts to contain the coronavirus. Regarding social distancing, the progress report described

efforts to open previously closed divisions, transition 175 tiers to single-cell housing, and reduce dormitory capacity to below fifty percent, except for detainees in certain medical or restricted housing. The Sheriff also had worked with criminal justice stakeholders to secure the release of more than 1,200 detainees with appropriate bond conditions, increased single-cell housing at the Jail by approximately 545%, and decreased double-celled housing at the Jail by over 90%.

The district court conducted a preliminary injunction hearing via videoconference and permitted each side to call one witness in addition to submitting affidavits. The court ultimately granted Plaintiffs' motion in part. Regarding Plaintiffs' § 1983 claim, the court conditionally certified the proposed class to the extent Plaintiffs requested a conversion of the temporary restraining order to a preliminary injunction and a mandate requiring increased social distancing. The court then proceeded to the question of whether Plaintiffs had demonstrated that they had a "better than negligible chance" of succeeding on their contention that the Sheriff's conduct in addressing the risks posed by exposure to the coronavirus is objectively unreasonable. The court acknowledged the "significant, and impressive, effort" the Sheriff had undertaken, and noted that, if this were an Eighth Amendment claim, this finding regarding the Sheriff's efforts would likely end the matter.

The court focused on Plaintiffs' renewed request for a policy precluding double celling and group sleeping arrangements to facilitate social distancing. The court first explained that the CDC Guidelines, which set a feasibility limitation on social distancing practices, are relevant but not dispositive. The court then determined that "group housing and double

celling subject detainees to a heightened, and potentially un-reasonable and therefore constitutionally unacceptable, risk of contracting and transmitting the coronavirus." Thus, after making a passing reference to the Sheriff's interest in discipline and security in the Jail and dismissing the Sheriff's contention that he faced feasibility limitations on further social distancing, the court concluded that Plaintiffs were reasonably likely to succeed on their contention that group housing and double celling is objectively unreasonable, except in certain situations. In arriving at this conclusion, the court did not discuss any other aspect of the Sheriff's response to COVID-19; instead, the court limited its discussion solely to the importance of social distancing. The court also rejected the Sheriff's argument that his compliance with the temporary restraining order rendered its extension into a preliminary injunction unnecessary because the court could not conclude that the constitutional violations would not recur absent such an extension. The court did not revisit any of its findings related to the measures it ordered in the temporary restraining order.

Regarding the remaining preliminary injunction factors, the district court determined that Plaintiffs had shown that, without additional measures, they would likely suffer irreparable harm—including severe illness and death—and that damages could not fully remedy the risk they faced. Lastly, the district court determined the balance of harms weighed in favor of Plaintiffs. The court therefore issued a preliminary injunction extending all of the relief included in the temporary restraining order, with the additional requirement of a policy precluding group housing and double celling except in certain situations, such as when a medical or mental health professional has determined a detainee poses a risk of suicide

or self-harm if placed in a single cell or when a detainee requires medical treatment not available in socially distanced housing.

The Sheriff appealed, challenging the entire preliminary injunction but directing the bulk of his arguments to the prohibition against double celling and group housing.

## II. Discussion

"To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)). If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. *Courthouse News Serv.*, 908 F.3d at 1068. This balancing process involves a "sliding scale" approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Mandatory preliminary injunctions—those "requiring an affirmative act by the defendant"—are "ordinarily cautiously viewed and sparingly issued." *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *see also Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (review of a preliminary injunction is "even more searching" when the injunction is "mandatory rather than prohibitory in nature.")

While we review the district court's balancing of the
harms for an abuse of discretion, we review its legal conclu-
sions de novo and its findings of fact for clear error. *C.Y.
Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 545 (7th Cir. 2020).
"[A] factual or legal error may alone be sufficient to establish
that the court 'abused its discretion' in making its final deter-
mination." *Lawson Prod., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437
(7th Cir. 1986). "Absent such errors," however, "we afford a
district court's decision 'great deference.'" *Speech First, Inc.*,
968 F.3d at 638 (quoting *Valencia v. City of Springfield*, 883 F.3d
959, 966 (7th Cir. 2018)).

**A. Socially Distanced Housing**

We first address the portion of the preliminary injunction
aimed at socially distanced housing because that is the thrust
of the Sheriff's appeal. The parties do not dispute the district
court's conclusions regarding the first two elements of the
preliminary injunction standard: that Plaintiffs would suffer
irreparable harm and that traditional legal remedies would be
inadequate. Rather, the debate focuses entirely on the likeli-
hood of success on the merits of their claim that the Sheriff's
actions (or inaction, as Plaintiffs contend) in response to
COVID-19 are objectively unreasonable. We therefore limit
our discussion to this threshold requirement.

We conclude that the district court committed three dis-
tinct legal errors: the court failed to consider the totality of the
circumstances, the court failed to afford proper deference to
the Sheriff's judgment in adopting policies necessary to en-
sure safety and security in the Jail, and the court recited an
incorrect legal standard when evaluating the likelihood that

Plaintiffs' contentions will succeed on their merits. We address each of these errors in turn.

### 1. Totality of the Conduct

We start with the proper scope of the analysis under the more recent objective reasonableness inquiry for pretrial conditions of confinement claims. In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court concluded that, when bringing an excessive force claim, a "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," rather than demonstrate deliberate indifference. *Id.* at 396–97. Recognizing "that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees," we held in *Miranda v. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018), that a pretrial detainee's claims of inadequate medical care also "are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Id.* at 352. We saw "nothing in the logic the Supreme Court used in *Kingsley*" to support a "dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause." *Id.* We likewise subsequently expanded this holding to encompass conditions of confinement claims under the Fourteenth Amendment Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (citing *Kingsley*, 576 U.S. at 396–97). Accordingly, we must analyze Plaintiffs' claim under the objective reasonableness inquiry articulated in *Kingsley*.[1] *Id*.

---

[1] Both the Sixth Circuit and the Eleventh Circuit have recently addressed conditions of confinement claims involving the coronavirus in prison settings. *See Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020), in *Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020). These Circuits, however, apply an Eighth Amendment deliberate indifference standard to pretrial detainee

The Supreme Court described the application of the objective reasonableness standard in *Kingsley*: "A court (judge or jury) cannot apply this standard mechanically. Rather, objective reasonableness turns on the facts and circumstances of each particular case." 576 U.S. at 397. We reiterated this principle in *McCann v. Ogle Cty., Illinois*, 909 F.3d 881 (7th Cir. 2018), explaining that, when evaluating whether challenged conduct is objectively unreasonable, courts must "focus on the totality of facts and circumstances." *Id.* at 886.

The district court erred by narrowly focusing its objective reasonableness analysis almost exclusively on social distancing instead of considering the totality of facts and circumstances, including all of the Sheriff's conduct in responding to and managing COVID-19. Citing *McCann*, the district court wrote, "To succeed on their claim, the plaintiffs must show that the Sheriff's conduct in addressing the risks posed by exposure to coronavirus is objectively unreasonable *in one or more respects*." (emphasis added). The district court then went on to emphasize social distancing and the Sheriff's efforts to implement social distancing to the exclusion of the Sheriff's other actions. This analysis incorrectly ignored the totality of the circumstances. It may very well be the case that a particular aspect of an action is so lacking that the failing on this one factor will lead a court to correctly conclude the entire course of challenged conduct was objectively unreasonable. It may

_____

conditions of confinement claims rather than the objectively unreasonable claim that we apply, and thus focus on a subjective element that is not at issue here.

also be that some actions or inactions are more consequential than others. But that does not mean that the court should evaluate each aspect of the disputed actions in a vacuum, especially in a case involving a systemic claim like here. Rather, the court must consider the total of the circumstances surrounding the challenged action.

In addition, the district court hinged its decision to impose a social distancing directive on the basis of one, and only one, key factual finding: "At the current stage of the pandemic, group housing and double celling subject detainees to a heightened … risk of contracting and transmitting the coronavirus." We do not suggest that this finding was erroneous: the district court had before it a voluminous evidentiary record about the importance of social distancing to reducing transmission of COVID-19. Instead, we take issue with what was missing: absent from the district court's reasoning was any mention of the totality of the measures the Sheriff already had taken to combat the spread of COVID-19, including those regarding social distancing. By the time the district court issued the preliminary injunction, the Sheriff had already implemented several such measures. Notably, and as the district court initially acknowledged in its temporary restraining order, these included substantial efforts to increase social distancing, such as opening shuttered divisions of the Jail, creating new single-cell housing, and decreasing the capacity of dormitories. The Sheriff had also undertaken extensive other measures to prevent and manage the spread of COVID-19 at the Jail. By failing to evaluate the request for a policy precluding double celling and group housing in light of the other aspects of the Sheriff's COVID response, the district court did not properly consider the totality of the facts and

circumstances when evaluating the objective unreasonableness of the Sheriff's actions.

### 2. *Deference to Correctional Administrators*

We turn to a second error: the failure to defer to correctional administrators in a matter implicating safety and security concerns. "When evaluating reasonableness, … courts must afford prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Henry v. Hulett*, -- F.3d --, 2020 WL 469188, (7th Cir. 2020) (en banc) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). Likewise, a court must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained." *Kingsley*, 576 U.S. at 397. Thus, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell*, 441 U.S. at 548 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). Correctional administrators must have "substantial discretion to devise reasonable solutions to the problems they face," particularly when safety and security interests are at stake. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012). Thus, "as part of the objective reasonableness analysis … deference to policies and practices needed to maintain order and institutional security is appropriate." *Kingsley*, 576 U.S. at 399–400.

When evaluating Plaintiffs' request for a policy precluding group housing and double celling, the district court made a passing reference to its obligation to "account for and give deference to the Sheriff's interest in managing the Jail facilities

and to practices that are needed to preserve order and discipline and maintain security." The district court, however, did not discuss in a meaningful way how, if at all, the considerable deference it owed to the judgment of prison administrators impacted its analysis. Undoubtedly, safety and security concerns play a significant role in a correctional administrator's housing decisions: jails and prisons require some degree of flexibility in choosing cell assignments, as they need to ensure, for example, that detainees are assigned to the living quarters corresponding with their security classifications and factoring in particular vulnerabilities that increase security risks. This is especially true at the Jail where the population fluctuates daily given the number of bookings and releases that take place. Correctional officers similarly must have the freedom to quickly reassign inmates when fights or other emergency situations occur that threaten the safety of staff and inmates. This is perhaps no more important than at a facility like the Cook County Jail, which houses a wide range of detainees accused of committing up to the most serious of violent offenses. Given the deference courts owe to correctional administrators on matters implicating safety concerns and the substantial role that security interests play in housing assignments, the failure to consider these interests was a legal error.

### 3. Likelihood of Success on the Merits

Lastly, we address a third issue: the proper standard for evaluating the likelihood of success on the merits when considering a motion for a preliminary injunction. The district court began its analysis of Plaintiffs' request for a policy requiring socially distanced housing by noting that, to demonstrate a likelihood of prevailing, Plaintiffs must show "only a

better than negligible chance of success." The district court explained this is a "low threshold."

As we just explained in *Illinois Republican Party v. Pritzker*, -- F.3d --, 2020 WL 5246656, at *2 (7th Cir. Sept. 3, 2020), "the 'better than negligible' standard was retired by the Supreme Court," and is not the proper standard to apply when evaluating the likelihood of success on the merits in a preliminary injunction motion. The standard originated in *Omega Satellite Prod. Co. v. City of Indianapolis*, 694 F.2d 119 (7th Cir. 1982). But like many instances of selectively quoted phrases, we did not use this phrase as an unadorned statement of the applicable standard. We said in *Omega*:

> If the harm to the plaintiff from denial of the preliminary injunction would be very great and the harm to the defendant from granting it very small, then the injunction should be granted even if the defendant has a better chance of prevailing on the merits than the plaintiff, provided the plaintiff's chances are better than negligible; and vice versa.

*Id*. at 123. As readily apparent, in context, we were explaining no more than what has become known as our sliding scale approach. Since *Omega*, though, we have at times—confusingly—cited the "better than negligible" phrase as if it were the proper standard for evaluating the likelihood of success on the merits at the preliminary injunction stage. *See Ill. Republican Party*, 2020 WL 5246656 at *2 (collecting cases).

The Supreme Court has invoked a higher standard. In *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008), the Court stated that "[a] plaintiff seeking a preliminary

injunction must establish that he is *likely* to succeed on the merits." *Id.* at 20 (emphasis added). Similarly, when discussing the requisite showing to establish irreparable injury, the Court explained that its standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis in original) (rejecting the Ninth Circuit's "possibility" standard as "too lenient"). The Court provided further guidance in *Nken v. Holder*, 556 U.S. 418 (2009), which set forth the standard governing motions for a stay pending appeal. Though a different context, "[t]here is substantial overlap between [the traditional stay factors] and the factors governing preliminary injunctions." *Id.* at 434 (citing *Winter*, 555 U.S. at 24). This is "not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.* The Court reiterated that under the "traditional" standard for a stay, the first factor asks "whether the stay applicant has made a strong showing that he is likely to succeed on the merits." *Id.* at 425–26 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). For that showing, the Court made clear, "[i]t is not enough that the chance of success on the merits be 'better than negligible,'" quoting with disapproval this court's decision in *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999). *Id.* at 434.

We thus reiterate that a plaintiff must demonstrate that "its claim has some likelihood of success on the merits," *see, e.g., Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018), not merely a "better than negligible" chance. What amounts to "some" depends on the facts of the case at hand because of our sliding scale approach. *See Ty, Inc.*, 237 F.3d at 895.

Here, in reliance on our prior precedent, the district court recited the incorrect "better than negligible" standard several times. In various instances, though, the district court's analysis indicates that it, in fact, applied a higher standard. In particular, the district court at times used language that Plaintiffs were "reasonably likely to succeed on their contention," and the court ultimately concluded that Plaintiffs had "far surpassed" the "better than negligible" standard. Thus, were the recitation of the incorrect standard the district court's only error, we could not say that the district court abused its discretion in imposing the social distancing requirement. But, when coupling this with the district court's other errors, we cannot be certain that Plaintiffs' showing of the likelihood of success on the merits of their claim would have surmounted the appropriate standard. We therefore reverse the portion of the preliminary injunction precluding double celling and group housing at the Jail.

We emphasize that we do not address the merits of whether Plaintiffs have demonstrated that they have suffered a constitutional violation. Indeed, our discussion solely addresses the legal errors the district court committed in the course of its preliminary injunction analysis. We reverse this portion of the preliminary injunction on the basis of these legal errors alone.

**B. Remaining Relief**

In the temporary restraining order, the district court granted several measures of relief to Plaintiffs, including requirements that the Sheriff implement procedures and policies related to sanitation, testing, and provision of face masks to detainees in quarantine. When the district court issued the preliminary injunction, it did not revisit its analysis on any of

these measures. Because the discussion pertaining to these measures resides in the temporary restraining order, we turn there for our analysis.

We affirm the aspects of the preliminary injunction that the district court converted from the temporary restraining order. In that order, the district court made detailed factual findings about the risks of COVID-19, the Sheriff's existing policies, and the execution of these policies, relying on hearing testimony and affidavits from Plaintiffs' experts, detainees, and correctional administrators. Importantly, the district court assessed the requested relief considering the totality of the Sheriff's conduct, rather than reviewing it in isolation. For example, the district court declined Plaintiffs' request to mandate testing of new detainees since the Sheriff already had in place a policy requiring detainees to quarantine for fourteen days upon their arrival to the Jail.

The district court also carefully considered the Sheriff's conduct in light of the CDC Guidelines and hewed closely to the Guidelines in its explanation of each measure of relief it ordered. The CDC Guidelines—like other administrative guidance—do not themselves set a constitutional standard. *See Bell*, 441 U.S. at 543 n.27 (noting that recommendations of a Department of Justice task force "regarding conditions of confinement for pretrial detainees are not determinative of the requirements of the Constitution"); *cf. J.K.J. v. Polk Cty.*, 960 F.3d 367, 384 (7th Cir. 2020) (en banc) (concluding that the guidelines set by the Prison Rape Elimination Act do not set a constitutional parameter under the more demanding *Monell* deliberate indifference standard). Indeed, "while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional

minima; rather, they establish goals recommended by the organization in question." *Bell*, 441 U.S. at 543 n.27. But even if
not dispositive, implementation (and proper execution) of
guidelines that express an expert agency's views on best practices are certainly relevant to an objective reasonableness determination. *United States v. Brown*, 871 F.3d 532, 537 (7th Cir.
2017) (noting that evidence of policy or procedure may be relevant to an objective reasonableness inquiry, even though it
does not set the constitutional standard). This is particularly
true here, where the CDC Guidelines provide the authoritative source of guidance on prevention and safety mechanisms
for a novel coronavirus in a historic global pandemic where
the public health standards are emerging and changing.

The CDC Guidelines differ in material ways from the police department regulations at issue in our decision in *Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006). In *Thompson*,
we determined that a policy on the use of force established by
the police department did not dictate the constitutional standard for the use of force. *Id.* at 454; *see Brown*, 871 F.3d at 537
(clarifying the holding of *Thompson*). But the CDC Guidelines,
arising from an expert, independent agency, are entitled to
greater weight than a police department's internally-crafted
regulations. *See Brown*, 871 F.3d at 537 ("[I]f compliance with
departmental policy were the applicable legal standard, the
police department itself would become the arbiter of Fourth
Amendment reasonableness—a prospect that would have
horrified those responsible for the Amendment's ratification."). The district court thus properly relied on these Guidelines in the course of its preliminary injunction analysis.

We note that, as it did with its discussion of Plaintiffs' request for an order precluding double celling and group

housing arrangements, the district court made only a passing reference to the Sheriff's interest in managing Jail facilities and its obligation to defer to policies and practices necessary to preserve order and security. Likewise, the court did not meaningfully discuss this deference in its analysis. We are less troubled, though, given the nature of the relief ordered. Whereas safety and security concerns are fundamental to housing assignments, this is not true to the same degree for measures pertaining to sanitation, testing, and providing facemasks. We therefore do not find legal error.

Lastly, we address a motion by the Sheriff to supplement the record with a CDC report—entitled "Outbreak of COVID-19 and Interventions in One of the Largest Jails in the United States—Cook County, IL, 2020"—and, alternatively, the Sheriff's request that this Court take judicial notice of it. We deny the motion to supplement the record as the district court has yet to consider this document in the first instance. *See Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 684 n.1 (7th Cir. 2020). We similarly decline to take judicial notice. "The Federal Rules of Evidence permit a court to take judicial notice of a fact that is 'not subject to reasonable dispute' because it is 'generally known' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *United States v. De La Torre*, 940 F.3d 938, 952 (7th Cir. 2019) (quoting Fed. R. Evid. 201(b)). The contents of this report—the Sheriff's COVID-19 interventions and their purported impact—are not "'generally known,' at least to us." *Id.* Further, we cannot determine if the sources can reasonably be questioned because the parties dispute who authored the report and the district court has not had the opportunity to make any factual findings on the author. Nor are the contents "incontrovertible," as its authors "were not subject to *Daubert*

challenges, cross-examined, or tested with competing expert testimony." *Id.* The contents of the report are thus "arguably subject to reasonable dispute," and therefore are not a proper subject of judicial notice.

### III. Conclusion

We commend Judge Kennelly for his handling of the motion, particularly in light of the many novel issues posed by the onset of COVID-19 and the case's emergent nature. We nevertheless REVERSE in part and VACATE the portion of the preliminary injunction precluding double celling and group housing because of the legal errors that arose as the district court applied the objective reasonableness standard recently announced in *Kingsley*. We AFFIRM the remainder of the preliminary injunction ruling.