In the

# United States Court of Appeals
### For the Seventh Circuit

No. 24-1945

CALVIN D. LEE,

*Plaintiff-Appellant,*

*v.*

MILWAUKEE COUNTY, WISCONSIN,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:22-cv-01089 — **William E. Duffin,** *Magistrate Judge.*

ARGUED MARCH 3, 2026 — DECIDED MAY 7, 2026

Before ROVNER, SCUDDER, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Calvin Lee filed a *pro se* lawsuit against Milwaukee County for allegedly unconstitutional conditions of confinement that he experienced while detained for two and a half years in the County's Jail. The district court granted summary judgment to the County, and Lee—now represented by counsel—appeals.

Lee's allegations are troubling: in particular, his descriptions of potential gaps in the Jail's mental-health resources give us pause. His medical conditions, a traumatic brain injury and post-traumatic stress disorder, are serious enough to mandate some level of care under the Fourteenth Amendment. And the County's attempt to insulate itself from liability by claiming that it lacked notice of any deficient care provided by its private contractor is a non-starter.

But on the sparse record before us, we cannot conclude that any of Lee's claims rise to the level of a constitutional violation. The little evidence available on the scope of Lee's mental-health needs does not raise a triable issue of fact as to whether the limited care the Jail *did* offer him was constitutionally insufficient. Though we sympathize with the challenges Lee undoubtedly faced in mustering this evidence while litigating the case *pro se* below, we find he failed to meet his burden at summary judgment. Thus, we affirm.

## I. Background

### A.  Factual Background

We take the following facts from the summary judgment record, drawing all reasonable inferences in Lee's favor as the nonmovant. *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022). Like the magistrate judge,[1] we construe his *pro se* filings below liberally and review the signed and sworn allegations in his amended complaint as an affidavit for summary judgment purposes. *Beal v. Beller*, 847 F.3d 897, 901–02 (7th Cir. 2017).

_____

[1] Magistrate Judge William E. Duffin presided over the case with the parties' consent.

Lee was a pretrial detainee at the Milwaukee County Jail from December 2020 to April 2023. The County contracts with Wellpath, LLC to provide routine medical services, including mental-health care, at the Jail. When Lee was initially processed at the Jail, he informed medical staff that he was a U.S. Army veteran with a documented history of traumatic brain injury, post-traumatic stress disorder, anxiety, insomnia, depression, headaches, and blackouts, as well as nerve pain. Lee said that he was "actively being treated" for these conditions before his detention. But the record yields few details about what this prior treatment entailed and contains no evidence that Lee was evaluated by a mental-health care professional upon intake. In fact, the record contains none of Lee's medical records from either before or during his time at the Jail.

Lee's arrival came midway through the COVID-19 pandemic when the Jail was struggling to curb transmission of the virus. As part of the Jail's efforts to control the spread of COVID-19, Lee and other detainees were regularly confined to their cells for extended periods of time in alternating shifts; Lee estimates these confinements could last as long as twenty-six and a half hours. The County, for its part, admits some of them lasted at least twenty-three hours. Lee also asserts that while the Jail eventually ended its formal COVID "lock-in policy," it continued to impose extended lockdowns throughout his incarceration, and that some lockdowns lasted at least forty-four hours. During some of these lockdowns, the Jail disabled toilets across entire cell blocks—a response, in the County's telling, to detainees flooding their cells.

In September 2021, a little over eight months into his detention, Lee filed a grievance complaining that the Jail had failed to provide him with "veteran services [and] resources,"

including "[m]ental [h]ealth resources." Correctional staff responded that the facility could not provide volunteer veteran services at that time, but that Lee should fill out a slip to request mental-health services, and closed Lee's grievance. Lee appealed, asserting he had already "requested mental health services, with no success" and that the facility was "ill equipped" to treat his specific combat-related issues. The appeal was forwarded to Wellpath staff, who informed Lee that they could not provide him with medication under the Jail's general policies, since his medical records from the Department of Veterans Affairs ("VA") did not reflect any recent active prescriptions. Wellpath listed the Jail's available mental-health services as "crisis intervention, brief counseling, medication management, [and] providing w[ri]tten materials to assist with mental health issues," but qualified that "[l]ong term therapy is not provided, such as in a prison setting."

Lee consistently filed grievances throughout his time at the Jail. He continued to complain about inadequate mental-health services, as well as treatment for his physical nerve pain. While it appears the Jail provided Lee with medication for his nerve pain, the record is ambiguous on what (if any) mental-health care he received. At some point after Lee had been confined for over a year, he went on a four-day hunger strike and was placed on suicide observation, during which he spoke with a staff psychiatrist. Beyond this, it is unclear what level of mental-health treatment Lee received at the Jail.

Lee also protested the recurring lockdowns in his grievances. And he called out a number of unhygienic conditions that he observed at the Jail, including fecal matter left in a broom closet, blood draws being conducted near food-service areas, clogged sinks in cells, and black mold in showers. Jail

staff responded to his grievances saying that these issues either would be or had already been addressed.

## B. Procedural History

Lee filed a lawsuit *pro se* against the County[2] in September 2022 while still detained at the Jail. He never moved for appointment of counsel. The district court screened his complaint and allowed him to proceed on several claims against the County under 42 U.S.C. § 1983 for inadequate medical treatment and unconstitutional conditions of confinement. After the parties consented to proceeding before a magistrate judge, the County moved for summary judgment on all of Lee's remaining claims.

In May 2024, the magistrate judge granted the County's motion and dismissed Lee's case in its entirety. The magistrate judge held that Lee had failed to raise a triable issue as to whether the Jail's COVID-related lockdown policies were unconstitutionally excessive. He likewise found none of Lee's cited unhygienic conditions objectively serious enough to raise constitutional concerns—let alone pervasive enough to

---

[2] Lee's original complaint named both the County and Wellpath as defendants. The district court ordered him to refile his claims against Wellpath separately. Lee did so, and Wellpath moved for summary judgment based on failure to exhaust administrative remedies, which the district court granted. Lee then separately appealed this dismissal. While we initially consolidated the two appeals for briefing and argument, we later deconsolidated and stayed the Wellpath appeal after Wellpath filed for bankruptcy. Lee has since notified the court of his intent to resume briefing his appeal against Wellpath with the contractor's Liquidating Trust substituted as defendant, but has yet to file a motion to that effect. Since exhaustion is not at issue in Lee's case against the County, we do not address it further.

show a widespread pattern or practice that could be attributed to the County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). And as to Lee's medical-care claim, he found no indication that Wellpath's treatment was objectively unreasonable, that any deficiency was formal or pervasive enough to create *Monell* liability, or that the County was on notice of any issues with Wellpath's care.

Lee appealed. After reviewing the parties' initial submissions, we determined that his case would benefit from further briefing and argument and appointed counsel to represent him before us. We thank appointed counsel for their able service on Lee's behalf.

## II. Discussion

We review the magistrate judge's grant of summary judgment *de novo. Stockton*, 44 F.4th at 614. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But summary judgment is not appropriate where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Stockton*, 44 F.4th at 614 (citation omitted). "A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge." *Id.* The nonmoving party must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017).

Lee's constitutional claims from his time as a pretrial detainee arise under the Fourteenth Amendment's Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019). To overcome the County's motion, he must first raise a triable issue as to whether the conditions he experienced at the Jail were objectively unreasonable. *Id.* at 823–24. Conditions are objectively unreasonable if they are imposed expressly to punish or are excessive in relation to a legitimate purpose. *Id.* at 822; *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

Since all of Lee's claims are brought against the County, he has several additional hurdles to clear under *Monell*, which requires § 1983 liability against local governments to be direct and not vicarious. At a high level, and without reciting all of *Monell*'s many nuances, Lee must:

(1) show that he was "deprived of a federal right";
(2) "trace the deprivation to some municipal action (i.e., a policy or custom) … attributable to the municipality itself";
(3) show "municipal fault"; and
(4) show that "the municipal action was the moving force behind the federal-rights violation."

*Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (cleaned up).

With these standards in mind, we turn to Lee's appeal. We first assess his claim relating to inadequate medical care, then his claim based on excessive lockdowns, and finally his claim over the Jail's unhygienic conditions.

**A. Medical-Care Claim**

Lee's claim of systemically unconstitutional gaps in the Jail's medical care presents the most challenging issue in this

case. We begin by touching on the County's defense of inadequate notice, before moving to the merits of Lee's constitutional claim.

In its brief on appeal, the County argued that Lee had failed to show the County was properly on "notice that inmates requiring more or different care were not receiving it" from Wellpath. The County contended that—even if Lee could show that the care he received was unconstitutional—he had failed to establish, under *Monell*'s "municipal fault" prong, that County policymakers were "aware of the risk created by [Wellpath's] custom or practice and … failed to take appropriate steps to protect [him]." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). All of Lee's medical-related grievances, the County pointed out, were forwarded directly to Wellpath staff. And it argued that Lee had not identified any "pattern of similar violations" tending to suggest the County's awareness and "conscious disregard" of any problem with Wellpath's services. *See Dean*, 18 F.4th at 236 (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 408 (1997)). Thus, in the County's view, it could not have been "on notice that [Wellpath's] medical policies were causing serious problems at the jail." *Hahn v. Walsh*, 762 F.3d 617, 638 (7th Cir. 2014).

We take no issue with the County's recitation of *Monell*'s basic notice requirement. Its efforts to use that requirement to insulate itself from liability through a private contractor is another story, one with more than a few troubling chapters. Under the settled law of our circuit, "[t]he County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012). The County's efforts to reargue this

established point of law by invoking *respondeat superior* do not hold water. "The underlying rationale," we noted in *King*, "is not based on *respondeat superior*, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Id.*

To this end, Lee need not—as the County argues—show a widespread pattern of issues with Wellpath's care to prove that the County was on notice of any constitutional violations. If Wellpath had an express policy of refusing to treat prisoners' cardiac arrests, for example, that is enough to establish the County's municipal fault whether or not Wellpath ever disclosed that policy to County officials. True, a plaintiff must still establish that their deprivation of rights was either formal or pervasive enough to constitute "municipal action" rather than an *individual employee's* isolated act. *Dean*, 18 F.4th at 235. And they must show that the action was taken with the requisite level of fault at a "policymaking level." *Id.* at 236 (citation omitted). But if they met their burden on these elements with evidence of Wellpath's policies or practices, those actions are properly attributable to the County, which does not contend that the scope of its delegation to Wellpath is anything less than absolute. *See, e.g.*, *Thomas*, 604 F.3d at 303 (recognizing county's potential *Monell* liability based on contractor's practices).

The County appeared to walk back its position at oral argument, acknowledging that Wellpath's policies are treated as the County's based on the breadth of its delegated authority. It was wise to do so: its initial position not only contravenes *King*, but would incentivize municipalities to shirk their constitutional obligations by sticking their heads in the sand. That is not our law.

With the County's notice argument disposed of, we turn to the first and most basic element in Lee's *Monell* claim: whether he suffered a constitutional injury. To satisfy this element, as a pretrial detainee, he must first show that the care he received was objectively unreasonable—that is, insufficient to abate a "serious risk of harm" from a reasonable officer's perspective. *Pittman ex rel. Hamilton v. Madison County*, 108 F.4th 561, 571–72 (7th Cir. 2024) ("*Pittman IV*") (citation omitted). Second, Lee must show that he was harmed as a result. *Miranda v. County of Lake*, 900 F.3d 335, 347 (7th Cir. 2018).

Under this standard, Lee's physical ailments—such as nerve pain—merit only brief discussion. Even if Lee could establish that these symptoms were objectively serious (which is not clear on this limited record), the County took affirmative steps in response by offering him injections of pain-management medication. Lee offers no evidence to suggest this course of treatment caused him unnecessary suffering. We agree with the magistrate judge that no reasonable jury could find Wellpath's actions on this front constitutionally deficient.

Lee's mental-health issues merit closer scrutiny. He avers that he has a documented history of traumatic brain injury and PTSD and was actively treated for these conditions at some point before entering the Jail. These conditions could certainly rise to the level of an "objectively serious" medical need for which at least some degree of treatment was necessary to avoid a substantial risk of harm. *Id.* at 346–47 (evaluating claim for failure to treat suicidal detainee's serious mental-health issues); *Pittman IV*, 108 F.4th at 566 (same); *cf. Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) (recognizing "mental illness" can be a "serious medical need" under the Eighth Amendment). And the County does not dispute

that Wellpath's staff were aware of Lee's conditions: Lee disclosed them upon intake, and Wellpath later notified him that it had received his prior medical history from the VA.

The problem is that Lee has not put forth any clinical evidence that would allow us to assess whether the mental-health care options the County *did* provide were objectively insufficient to meet his serious needs. It is clear enough that he himself found Wellpath's suite of available services—"crisis intervention, brief counseling, [and] medication management," but not "long term therapy"—inadequate to treat his combat-related issues. But the record contains precious little information on the scope and severity of his conditions, what treatment he was receiving before he arrived at the Jail, and whether and how Wellpath evaluated his neurological and psychiatric symptoms once he got there. Without this information, we have no principled basis to conclude that the treatment Wellpath offered him was objectively unreasonable. *Cf. Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (noting, in the context of the Eighth Amendment, that "an inmate is not entitled to demand specific care," but only to "reasonable measures to meet a substantial risk of serious harm").

We understand the difficult burden Lee faces on this issue: he litigated the case *pro se* below and lacked access to the kinds of evidentiary tools, such as expert testimony, that could help define the precise contours of his mental-health needs. *See James v. Eli*, 889 F.3d 320, 328 (7th Cir. 2018) (noting that "cases involving complex medical evidence are typically more difficult for pro se litigants" who have "received at least *some* treatment" (cleaned up)); *Pennewell v. Parish*, 923 F.3d 486, 491 (7th Cir. 2019) (describing the "untenable and abstruse position" an inmate faced in "unearthing evidence that

a substantial departure from accepted medical standards occurred"). In acknowledging the barriers Lee faced as a *pro se* litigant, we do not mean to imply that expert testimony or other clinical evidence is *per se* necessary for incarcerated plaintiffs' medical-care claims to withstand summary judgment. *See, e.g.*, *Jackson v. Sheriff of Winnebago County*, 74 F.4th 496, 502 (7th Cir. 2023) (finding expert testimony unnecessary to allow a jury to determine whether delay in medical care diminished pretrial detainee's chances of survival).

Nor do we discount the seriousness of any potential gaps in the County's mental-health services. Lee was incarcerated at the Jail for over two and a half years. The record is ambiguous on whether the County, through Wellpath, in fact maintained a blanket policy of denying "long term therapy" for pretrial detainees regardless of a detainee's objectively established need for such care. But such a policy, were it in place, could raise constitutional concerns. *See Wellman v. Faulkner*, 715 F.2d 269, 272–73 (7th Cir. 1983) (describing two-year vacancy in prison's staff psychiatrist position as a "serious systemic deficiency").

Here, however, we need not (and do not) reach *Monell*'s "policy" inquiry, since we conclude on the record before us that Lee's claim ultimately founders at the initial step of showing an underlying constitutional violation. Since Lee has not put forth "specific, admissible evidence showing that there is a genuine dispute of material fact for trial" on whether the medical care he received at the Jail was objectively unreasonable, he has failed to meet his burden at summary judgment. *Grant*, 870 F.3d at 568. Even if Wellpath's long-term therapy policy is read to set the stage for a constitutional violation, we lack a sufficient basis to conclude that one may

have occurred here. Thus, we must affirm the magistrate judge's grant of summary judgment on Lee's medical-care claim.

## B. Excessive-Lockdown Claim

Lee's other claims stem from conditions that are far from ideal, but again do not rise to the level of a constitutional violation. We turn next to his challenges to the Jail's lockdown policies.

A pretrial detainee has "no general liberty interest in movement outside of his cell guaranteed by the Due Process Clause." *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). Lockdowns only transgress the Fourteenth Amendment when they become punitive, i.e. when they are not "reasonably related to a legitimate governmental objective" or are "excessive in relation" to that objective. *Bell*, 441 U.S. at 538–39.

On this record, a reasonable jury could not conclude that the Jail's lockdowns during Lee's incarceration were unconstitutionally excessive. The Jail had a legitimate interest in protecting its detainees during the pandemic by reducing transmission of the COVID-19 virus, and we are ill-equipped to second-guess whether its resulting lockdown policies were adequately tailored to that interest. *See Mays v. Dart*, 974 F.3d 810, 819–21 (7th Cir. 2020). Lee identifies alternative steps the Jail could have taken, such as allowing inmates out of their cells more frequently in smaller rotating groups or relocating inmates to decompress the Jail's population. But Jail administrators were caught in the unenviable position of facing suits from some inmates for failing to adequately protect them from COVID-19, on one hand, and suits from inmates like Lee for implementing allegedly excessive restrictions, on the

other. While Lee's proposals might have benefited the Jail's inmates in retrospect, the Fourteenth Amendment's requirements should not be confused with "a court's idea of how best to operate a detention facility."[3] *Bell*, 441 U.S. at 539.

Lee also points to certain lockdowns from mid-2021 onward that were not clearly related to COVID safety concerns. But his complaint and grievances only reference a handful of lockdowns that fall into this camp. Even if Lee could show that these instances were overtly punitive or excessive to the point of punishment, he has failed to either tie them to an express policy or show that they were sufficiently pervasive to constitute a *de facto* practice for *Monell* purposes. A "random event" or isolated series of events does not amount to a "widespread custom or practice" under *Monell*. *Thomas*, 604 F.3d at 303. We therefore affirm the magistrate judge's judgment on Lee's excessive-lockdown claim.

## C. Unsanitary-Conditions Claim

Lee has also failed to raise a triable issue as to whether the Jail's unsanitary conditions deprived him of a constitutional right. Broadly, Lee attacks a host of different unhygienic incidents at the Jail, including fecal matter left in a broom closet for multiple weeks, "food being served in the same area that blood labs were being drawn," a clogged sink in Lee's cell,

---

[3] Lee alternatively challenges the lockdowns as excessively restricting his ability to exercise. *See, e.g.*, *Lock v. Jenkins*, 641 F.2d 488, 493 (7th Cir. 1981) (recognizing due-process violation where inmates were confined to small cells "for the overwhelming portion of their waking and sleeping hours"). While we do not question the importance of inmates' access to exercise, none of the cases Lee cites addressed the countervailing safety interests implicated by the "unprecedented" COVID-19 pandemic. *Mays*, 974 F.3d at 814.

and black mold in showers. Jail officials have a duty to ensure that inmates are afforded "the minimum civilized measure of life's necessities, including adequate sanitation and personal hygiene items." *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) (*per curiam*) (cleaned up). While individual substandard conditions are not always "serious enough to work constitutional violations," they may "violate the Constitution in combination when they have a 'mutually enforcing effect that produces the deprivation of a single, identifiable human need.'" *Id.* at 842–43 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

Lee's unsanitary-conditions claim, too, fails under multiple prongs of *Monell*. His grievances do not isolate a single issue or recurring pattern of issues, but rather a grab-bag of different complaints—all occurring while Jail resources were taxed during the COVID-19 pandemic and its immediate aftermath. These incidents are "certainly unpleasant," and the County "deserves no praise for permitting them to persist." *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). But in this context, we lack sufficient evidence to infer either that they manifested a "single, identifiable" deprivation or are traceable to a widespread practice of constitutionally unacceptable maintenance. *Budd*, 711 F.3d at 843 (citation omitted).

Jail staff typically responded within a week indicating that Lee's complaints would be or had already been addressed. *Sain*, 512 F.3d at 894 (finding inmate's pest complaints insufficiently serious where "an exterminator regularly visited his cell … and also would come in response to [his] complaints"). Even inferring in Lee's favor that staff never actually followed through on these promises, the record lacks evidence that most of his specific complaints ever recurred. *Cf. Antonelli*, 81 F.3d at 1431 (reversing dismissal at

pleading stage where inmate described sixteen-month pest infestation); *Budd*, 711 F.3d at 842 (reversing dismissal at screening stage where inmate alleged repeated stays in facility without adequate bedding or functioning heat over multiple years).

The closest Lee comes to identifying a systemic pattern of unhygienic conditions is the Jail's apparent practice of shutting off toilets in entire cell blocks for prolonged periods of time, forcing inmates to live with their own waste. The County's summary-judgment response explains these shutoffs as an emergency response to other inmates flooding their cells during the COVID-19 pandemic. The cell-block-wide shutoffs were evidently a function of the Jail's plumbing system, which does not permit more targeted shutoffs to individual cells. While the toilet shutoffs are unsanitary and unsavory, and might on a different record cross the line into an unconstitutional practice, the Jail has put forth a legitimate justification for their necessity in the specific case before us. We cannot reasonably conclude, without knowing more about the circumstances, that they constituted excessive punishment. *Bell*, 441 U.S. at 538–39; *cf. Hardeman*, 933 F.3d at 819, 824–25 (affirming qualified-immunity denial at pleading stage where jail administrators shut off water without forewarning inmates as part of planned shutdown to fix water tank, and punished inmates who complained with lockdowns).

### III. Conclusion

We AFFIRM.