In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-2956

MATTHEW METZLER,

*Plaintiff-Appellant,*

*v.*

LOYOLA UNIVERSITY CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-7335 — **Steven C. Seeger**, *Judge.*

ARGUED SEPTEMBER 22, 2025 — DECIDED JANUARY 13, 2026

Before EASTERBROOK, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Loyola University Chicago expelled
Matthew Metzler in January 2017 after the University found
him culpable for sexual misconduct. Metzler sued Loyola,
claiming his expulsion amounted to unlawful sex discrimina-
tion under Title IX and a breach of contract. The district court
granted summary judgment to Loyola, reasoning there was
insufficient evidence to support a finding of sex

discrimination for either a Title IX violation or Metzler's contract claim. We affirm.

## I. Background

### A. Factual Background

After Metzler and a fellow undergraduate student, pseudonymously named Jane Roe, met on a shuttle bus, the two arranged a first date. This set off a short relationship involving three relevant encounters in mid-January 2016. Metzler and Roe agree they engaged in sexual activity. But according to Roe, Metzler pressured her into many sexual acts, without obtaining her consent and over her protestations.

Roe described the events days later to her athletic coach, which in turn led to a January 26 meeting with Loyola's Deputy Title IX Coordinator, Rabia Khan Harvey. Roe and Khan Harvey discussed the incidents, but Roe said she did not want to move forward with a formal complaint. Khan Harvey, summarizing their conversation that day, wrote that although Roe "doesn't believe she was forced or coerced, she performed oral sex on the accused student and now feels that he is trying to manipulate the situation by accusing her that she'll report that he raped her."

Later in the spring semester, Roe saw Metzler at an athletic facility and met with the Title IX coordinator for athletics, Jay Malcolm, to report her distress. Malcolm explained that given the lack of a formal complaint, Loyola had limited options to address her concerns.

The following fall, Roe saw Metzler again and reported to Malcom that she felt unsafe. She expressed interest in transferring schools due to the anxiety of knowing she might run into Metzler. Roe also met with Khan Harvey's interim

replacement, Tim Love. In late October, she decided to file a complaint against Metzler.

Roe's complaint triggered student misconduct procedures outlined by Loyola's community standards, which the parties agree bound them as a contractual agreement. After notifying Metzler of the complaint against him, Love assigned two Loyola officials to investigate the accusations and prepare a final investigation report. A hearing board composed of Loyola administrators would consider that report and oversee a proceeding involving Roe and Metzler before resolving her complaint. Love discussed this process in a meeting with Metzler. Around the same time Roe filed her complaint, a former Loyola student who had connected with Roe over allegedly similar experiences also filed a complaint against Metzler. Love explained to Metzler that though the same investigators would work on the report for each complaint, distinct hearing boards would oversee the complaints to ensure fairness and proper focus.

The investigators interviewed Roe and Metzler separately in early December 2016, and they made audio recordings of the interviews. During his interview, Metzler provided the names of two potential witnesses. The first, Metzler's roommate, was nearby before and during the first of the three incidents. After that first incident, Metzler and Roe then visited the second potential witness, according to Metzler's appeal. The investigators did not interview either individual, but they did interview Roe's roommate, to whom Roe confided her account of the events. They also considered evidence, provided by Metzler, of text messages between Roe and Metzler.

The investigators and Love prepared the final investigation report, with Love drafting the "History of the Case"

section. Although that section represented that Roe had met with Khan Harvey, it did not relay Khan Harvey's description of Roe's account, namely that Roe did not believe Metzler had forced or coerced her. The report contained Metzler's account of the events, including that, in a conversation immediately preceding the second incident, Metzler and Roe "mutually agreed that they had moved fast physically and 'that no one was coerced.'" An investigator sent Metzler a draft of the final investigation report for his review and input. Aside from noting an additional fact not material here as "the only change [he] would somehow incorporate," Metzler wrote back "confirm[ing]" that the report "accurately represent[ed] [his] perspective from the interviews."

Two days later, Metzler and Roe appeared before the hearing board. Each brought an advisor, who was limited to playing a minimal, supportive role. The chair of the hearing board outlined that neither Metzler nor Roe could cross-examine one another, but they could propose questions for the board to ask the other party. They also could provide uninterrupted closing statements to the board, review documents concerning the alleged violations, and refute any information.

During the proceeding, the board's chair raised Metzler's account that, as written in the report Metzler reviewed and approved, he and Roe "mutually agreed that they had moved fast physically and 'that no one was coerced'" in a conversation preceding the second incident. When the chair asked Metzler how the subject of coercion came up in this conversation, however, Metzler responded that the subject did not arise. Metzler said the quotation marks around "no one was coerced" misrepresented his comment to the investigators as stating a precise topic of discussion. After the chair turned to

one of the investigators for input, the investigator said they had intentionally put the phrase in quotation marks because Metzler repeatedly used that language in describing what he and Roe agreed upon in their conversation. Metzler's hearing regarding the second complaint took place later that same day.

A few days later, the hearing board overseeing Roe's complaint issued a letter of decision. The board found Metzler "responsible for engaging in non-consensual sexual contact and non-consensual sexual penetration" and ordered Metzler expelled. The board rested its rationale largely on Roe's stronger credibility. While Roe presented a consistent account and even provided information against her interest, including by correcting the investigation report to indicate she at points removed some of her clothing herself, the board questioned Metzler's credibility given his apparent inconsistency on whether he discussed coercion with Roe. In light of the governing preponderance-of-the-evidence standard, the board adopted Roe's account for the purpose of assessing whether Metzler violated the community standards.

The board overseeing the second complaint issued a decision letter the same day. It found Metzler not responsible for any alleged policy violations.

Metzler appealed the decision on Roe's complaint. His appeal criticized the board for not considering his two witnesses and the transcript of his interview with the investigators. During the appeal, Roe heard about Metzler's presence on campus and complained to Love, who apologized for not informing her beforehand that the University had stayed Metzler's expulsion pending the decision on his appeal. The appeals officer affirmed the board's decision in January 2017 on the basis

Metzler had not established any of the three grounds justifying reversal: new substantive information not previously discoverable, a "substantive procedural error" denying the respondent the right to a fair hearing, or a finding manifestly contrary to the evidence. Loyola reinstated its expulsion. After informing Roe of the outcome, Love shared with colleagues his impression that they could "expect continued positive relations and partnership with [Roe] and the survivor community moving forward."

**B. Procedural Background**

Metzler filed suit against Loyola in November 2018 under the pseudonym John Doe. He brought claims for violation of Title IX and breach of contract. The parties filed cross-motions for summary judgment, and the district court granted summary judgment for Loyola. Metzler appealed. We remanded the case for the district court to determine whether Metzler could proceed anonymously and whether Metzler's graduation from a separate undergraduate institution rendered his claims moot. *See Doe v. Loyola Univ. Chi.*, 100 F.4th 910, 914 (7th Cir. 2024).

On remand, the district court ruled Metzler could no longer proceed under the pseudonym John Doe, and Metzler chose to continue litigation under his legal name. The district court also found Metzler's claims constituted a live controversy.[1] Assured of its jurisdiction, the district court then

---

[1] The district court found Metzler's claim for compensatory damages justiciable in light of lost income and an application fee attributable to his expulsion. The court similarly found Metzler's claim for injunctive relief justiciable, referencing caselaw holding claims seeking expungement of

issued an amended judgment in favor of Loyola. Metzler appeals.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Vassileva v. City of Chicago*, 118 F.4th 869, 873 (7th Cir. 2024) (citing *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022)). In doing so, "we construe all facts and make all reasonable inferences in the non-moving party's favor." *Id.* (quoting *Parkey v. Sample*, 623 F.3d 1163, 1165 (7th Cir. 2010)). We affirm "summary judgment only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(a)). "[A] movant may prevail at summary judgment by showing an absence of evidence to support the non-movant's claims." *Upchurch v. Indiana*, 146 F.4th 579, 586 (7th Cir. 2025) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

Metzler appeals the district court's judgment with respect to both his Title IX and contract claims, so we consider each in turn.

### A. Title IX Claim

A plaintiff proves a Title IX claim by showing "(1) the educational institution received federal funding, (2) [the]

---

disciplinary violations constitute a live controversy. *See Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007). We are satisfied Metzler's claims are not moot.

plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against [the] plaintiff based on gender." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022) (alteration in original) (quoting *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019)); *see* 20 U.S.C. § 1681(a). Loyola does not dispute the first two elements; Loyola received federal funding and denied Metzler educational benefits by expelling him. *See Gash v. Rosalind Franklin Univ.*, 117 F.4th 957, 961 (7th Cir. 2024). Therefore, Metzler's claim depends on whether Loyola discriminated against him "on the basis of sex." 20 U.S.C. § 1681(a); *see Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019).

To avoid summary judgment, Metzler must show there is enough evidence in the record from which a reasonable factfinder could conclude "the university discriminated against [him] 'on the basis of sex.'" *See Purdue*, 928 F.3d at 667–68 (quoting 20 U.S.C. § 1681(a)); *accord Gash*, 117 F.4th at 962. The "ultimate inquiry must consider the totality of the circumstances." *Id.* (quoting *S. Ind.*, 43 F.4th at 792). Consistent with this, we view the evidence holistically to assess an overall likelihood of discrimination rather than ask whether a "particular piece of evidence proves the case by itself." *Gash*, 117 F.4th at 962 (quoting *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 924 (7th Cir. 2020)).

Title IX specifically prohibits sex discrimination, not botched disciplinary proceedings. "Coming to the wrong answer in deciding who was to blame for unwelcome events in a romantic relationship, … or interviewing the wrong potential witnesses, or listening to too few or too many witnesses … are of no concern under federal law unless the defendants

treated men worse than women (or the reverse)." *Doe v. Trs. of Ind. Univ.*, 101 F.4th 485, 489 (7th Cir. 2024). For that reason, "a plaintiff cannot prove gender discrimination by merely identifying mistakes or imperfections in the process." *S. Ind.*, 43 F.4th at 793.

Just as procedural errors are themselves inadequate to support sex discrimination, so too are other sex-neutral issues, like anti-respondent bias. *See Gash*, 117 F.4th at 965; *Columbia Coll. Chi.*, 933 F.3d at 856. An error "facially divorced from sex" or "no more suggestive of sex discrimination than … of lawful alternative explanations, like incompetence, impatience, or pro-complainant bias" does not support a claim of sex discrimination. *Gash*, 117 F.4th at 967 (citation modified). "[P]ro-victim or pro-complainant bias [] cannot support a claim for sex discrimination because both men and women can be victims of sexual assault." *Id.* (citing *S. Ind.*, 43 F.4th at 798 n.8).

Metzler relies on several categories of evidence to support his claim.

### 1. Public Pressure

Metzler points to evidence of public pressure on Loyola to support his sex-discrimination claim. We have held that evidence of public pressure on a university concerning its handling of sexual misconduct can be relevant to Title IX sex-discrimination claims. *Purdue*, 928 F.3d at 668. This pressure may motivate a university to demonstrate its vigorous

enforcement of Title IX by discriminating against men accused of sexual assault. *See id.*[2]

As evidence of this pressure, Metzler cites policy guidance the Department of Education shared in 2011 with universities receiving federal funding and thus subject to Title IX in the form of a "Dear Colleague" letter. Metzler is not the first plaintiff to cite this guidance. *See Gash*, 117 F.4th at 962–63 (collecting cases). The letter encouraged schools to adopt "a more rigorous approach to campus sexual misconduct allegations" through measures like broadening the definition of sexual harassment, applying a preponderance-of-the-evidence standard, and prioritizing the resolution of sexual harassment claims. *Purdue*, 928 F.3d at 668 (citing United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter (2011), https://perma.cc/4MQV-8RPC). The letter also suggested that schools risked losing all federal funding if they did not demonstrate vigorous enforcement of sexual misconduct violations. *See id.* Metzler further cites pressure on Loyola from student groups like Students for Reproductive Justice to more strictly enforce sexual misconduct policies. He claims

---

[2] The district court did not consider the evidence of public pressure when considering Metzler's Title IX claim, reasoning that generalized evidence was only relevant if Metzler provided facts creating an inference of sex bias in his specific proceeding. This view misapplies our totality-of-the-circumstances test, the point of which is to consider all relevant circumstances. *See Gash*, 117 F.4th at 962 ("[T]he 'ultimate inquiry must consider the totality of the circumstances.'" (quoting *S. Ind.*, 43 F.4th at 792)). As explained below, however, considering the evidence of public pressure does not change the outcome here.

this pressure supports Loyola's motive to tilt the disciplinary process against men.

This evidence of public pressure is relevant to Metzler's Title IX claim. *See id.* at 669 ("The ['Dear Colleague'] letter and accompanying pressure gives John a story about why Purdue might have been motivated to discriminate against males accused of sexual assault."); *S. Ind.*, 43 F.4th at 792. Still, Metzler provides less evidence of a discriminatory motive than was present in *Purdue*, to which he analogizes his case. There, unlike here, contemporaneous federal investigations into the university's handling of sexual misconduct cases made the public pressure "far from abstract." *Purdue*, 928 F.3d at 668. Even putting aside Metzler's analogy, though, we have made clear that "[p]ublic pressure is not enough on its own to support a claim of discrimination …." *S. Ind.*, 43 F.4th at 792 (first citing *Purdue*, 928 F.3d at 669; and then citing *Columbia Coll. Chi.*, 933 F.3d at 855); *see also Gash*, 117 F.4th at 963 (same). A plaintiff must also show evidence of discrimination "particular to his case." *See Columbia Coll. Chi.*, 933 F.3d at 855 (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018)); *Purdue*, 928 F.3d at 669; *S. Ind.*, 43 F.4th at 792. Metzler fails to do that here.

**2. Credibility Assessment**

Metzler also relies on the board's credibility determination to show sex bias in his proceeding. As Metzler notes, a member of the hearing board later testified he was skeptical of Metzler's claim that Roe eagerly initiated sex given she characterized the first incident as her first sexual experience. Metzler describes the board member's inference as "in line with gender stereotypes" of women as passive and men as aggressive. But the board member's inference did not refer to this sex-based stereotype. Instead, the board member based his

inference on sexual inexperience. Even accepting the relevance of a board member's post-hoc rationalization, Metzler does not contest the reasonableness of the board member's inference that sexually inexperienced persons are less likely to eagerly and comfortably initiate sexual activity. Metzler does not overcome that the board member's inference was "divorced from gender." *Columbia Coll. Chi.*, 933 F.3d at 856; *see Gash*, 117 F.4th at 967.

Metzler also claims that the credibility determination itself supports sex bias because it was incorrect. Showing the board made an incorrect credibility determination is insufficient to show sex bias, however; the plaintiff must show the board's decision to credit Roe was on the basis of sex. *See S. Ind.*, 43 F.4th at 799; *Gash*, 117 F.4th at 967 ("Even if Gash is correct that based on these facts the panel reached the wrong conclusion [on credibility], he has not alleged facts that the panel did so because he is male."). And Metzler's only evidence that the board relied on gender in its credibility determination, as addressed above, is divorced from sex.

Metzler's further assertion that the record supports sex discrimination because the credibility determination was unreasonable similarly fails. Although we have suggested an erroneous determination in a "sufficiently lopsided" case may support gender bias, we indicated such circumstances arise where a board reached its determination "without an apparent reason based in the evidence." *S. Ind.*, 43 F.4th at 799–800 (*Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016)). Here, the board made its credibility determination after hearing directly from Metzler and Roe. *Cf. Purdue*, 928 F.3d at 664. The board also cited sound reasons for crediting Roe, such as her offering statements against her interest and an apparent

inconsistency in Metzler's account. We do not hold a university's disciplinary board "to a higher standard than we hold district courts," *id.* at 800 (quoting *Samford*, 29 F.4th at 691), and "[w]e give substantial deference to a district court's credibility determinations," *United States v. Brown*, 809 F.3d 371, 373 (7th Cir. 2016). Metzler does not point to evidence overcoming this hurdle.

### 3. Procedural Errors

Metzler also points to procedural irregularities that he claims cumulatively show Loyola's effort to discriminate against him based on sex. *See S. Ind.*, 43 F.4th at 793. Metzler must show these errors constitute "evidence of gender bias rather than at most simply mistakes." *S. Ind.*, 43 F.4th at 799; *accord Gash*, 117 F.4th at 965–66.

There are two facts that, viewed in the light most favorable to Metzler, support a possible inference that Loyola breached its own policies in Metzler's proceeding. The first of these is the more concerning of the two: neither the investigators nor the hearing board considered Khan Harvey's account of Roe's belief soon after the disputed events that she was not "forced or coerced." Khan Harvey's report qualifies as "relevant information," which the community standards charged the investigators with collecting for their final investigation report. Metzler has no evidence, however, connecting this error to sex bias, and the error alone does not create an issue of fact. We have explained that an error is unpersuasive when it is "no more suggestive of sex discrimination than it is of lawful alternative explanations, like incompetence, impatience, or pro-complainant bias." *Gash*, 117 F.4th at 967. Metzler has no evidence distinguishing the omission of Khan Harvey's

summary from a mistake based on incompetence, impatience, or pro-complainant bias.

The second possible error concerns the investigators' decision not to interview Metzler's witnesses even as they interviewed Roe's roommate. This decision might have contravened the policy that "investigators will interview … relevant witnesses that can provide a firsthand account of something … related to the alleged incident." But again, Metzler presents no evidence that this decision was tied to sex bias; he relies on the decision itself. That may be more persuasive where a university "refus[ed]" the respondent permission to present witnesses. *See id.* at 965 (citing *Purdue*, 928 F.3d at 658). But, crucially, Metzler does not claim he informed the investigators of the witnesses' relevance or asked the investigators to interview the witnesses before he appealed the board's unfavorable decision—at which point he could prevail on only three narrow grounds. Metzler's claim therefore falls under our warning that, absent evidence of sex bias, simply showing the university "listen[ed] to too few … witnesses [is] of no concern" under Title IX. *Trs. of Ind.*, 101 F.4th at 489. To be sure, some communication suggests Loyola was influenced by a desire to reach a decision before the end of the fall semester. But impatience is not sex bias. *See Gash*, 117 F.4th at 967.

Metzler argues that a number of other procedural irregularities support sex bias, yet he lacks evidence not only connecting the purported irregularities to sex bias but also showing them as irregularities at all. *See S. Ind.*, 43 F.4th at 794 (rejecting alleged procedural irregularities that were "not errors at all" or "applied equally to both" respondent and complainant); *see also Columbia Coll. Chi.*, 933 F.3d at 856 (rejecting allegations of procedural deficiency not reflecting deficiency).

Metzler notes Love communicated with Roe and the appeals officer during the proceedings and that Love related the existence of a second complaint to a member of his hearing board, but he does not connect these facts to sex bias. He also lacks any evidence these communications deviated from any governing policy or practice. Metzler points to no rules barring Love's communications and Love still upheld his personal assurance to Metzler of two distinct hearing boards.

Similarly, Metzler's complaint that the University deleted the audio recording of his interview with investigators rings hollow when there is no evidence Loyola acted on the basis of sex. For example, there is no evidence Loyola treated Roe's recording differently. Nor does Metzler substantiate a procedural error. In fact, the community standards provided that the audio recordings would "not be shared beyond the [i]nvestigators" and would be "retained as needed at the discretion of the university." Without any evidence Loyola violated rules or norms, much less that these facts connect to sex bias, this evidence provides no support for the conclusion that Loyola flouted rules to discriminate against Metzler on the basis of sex.

Although Metzler has identified at most two procedural errors—ignoring Khan Harvey's report and failing to interview his witnesses —he lacks evidence connecting those two procedural errors to sex bias, leaving them indistinguishable from mistakes. *See S. Ind.*, 43 F.4th at 793. As we noted in *University of Southern Indiana*, "few trials in civil courts are error-free, [and] appellate courts do not quickly infer that procedural errors in a trial show the judge was biased." *Id.* Nor can Metzler fall back on the possibility that the sheer magnitude of the procedural errors itself supports sex bias. *See id.* With

these two errors alone and the process Loyola provided Metzler, this is far from such a case. *See id.* at 799 (errors reflected mistakes rather than sex bias); *Gash*, 117 F.4th at 967 (same). Federal courts do not micro-manage disciplinary hearings for universities.

### 4. Totality of the Circumstances

In aggregate, we are left with a background of non-individualized pressure on all universities receiving federal funding, credibility determinations divorced from gender, and two procedural errors that similarly lack an adequate evidentiary connection to gender bias. When it comes to several other purported procedural errors, Metzler lacks evidence that they were in fact errors, much less reflect sex bias. Though we view the record in the light most favorable to Metzler, we do not fill in evidentiary holes with speculation. *See Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011) (citing *Davis v. Carter*, 452 F.3d 686, 697 (7th Cir. 2006)). Considering the circumstances together, no reasonable factfinder could conclude Loyola discriminated against Metzler on the basis of sex. Indeed, "'generalized allegations' about 'the "Dear Colleague" letter,' even when combined with allegations of procedural impropriety," do not support a claim of sex discrimination under Title IX. *Gash*, 117 F.4th at 963 (quoting *Columbia Coll. Chi.*, 933 F.3d at 855–56)).

### B. Breach of Contract

Metzler argues that, because the community standards bound Metzler and Loyola, Loyola breached that contract by expelling him through a disciplinary proceeding inconsistent with the community standards. Metzler acknowledges that Loyola could expel him for breaching the community

standards and that, in light of Loyola's academic discretion, we only find a breach when a university's decision is "without any rational basis." *Columbia Coll. Chi.*, 933 F.3d at 858 (citing *Frederick v. Nw. Univ. Dental Sch.*, 617 N.E.2d 382, 387 (Ill. 1993)). These circumstances arise when a university "did not exercise its academic judgment at all, instead acting arbitrarily or in bad faith in its treatment of plaintiff." *Id.* (quoting *Raethz v. Aurora Univ.*, 805 N.E.2d 696, 700 (Ill. 2004)); *Gash*, 117 F.4th at 968. Metzler argues that he meets this standard by proving gender was a motivating factor in Loyola's decision to expel him. Because Metzler relies on his Title IX argument, we reject this contract claim for the same reasons we reject his Title IX claim.

Metzler's second theory of contractual liability, that Loyola lacked a rational basis in expelling him because the University made its decision in order to placate Roe and campus activists, also fails. Metzler acknowledges Loyola only needs a rational basis for expulsion and that his breach of the community standards would entitle the University to expel him. But identifying procedural errors does not negate a rational basis. Even if his proceeding suffered from errors, a substantiated accusation of sexual misconduct constituted a rational basis. Metzler does not muster evidence to displace that conclusion.

\* \* \*

It is not this court's responsibility to provide a "fourth forum[] … to decide what actually happened" between Metzler and Roe. *See S. Ind.*, 43 F.4th at 792. "Coming to the wrong answer in deciding who was to blame for unwelcome events in a romantic relationship … [is] of no concern to federal law unless the defendants treated men worse than women …."

*Trs. of Ind.*, 101 F.4th at 489. Metzler did not marshal enough evidence from which a reasonable factfinder could conclude that Loyola made its disciplinary decision on the basis of sex.

*     *     *

The judgment of the district court is

AFFIRMED.